**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**John Doe** *pro se*,

    **Plaintiff,**

                                                1:25-cv-1450 (AMN/ML)

**v.**

**ALBANY LAW SCHOOL,** *a private law school in Albany, New York*;

**GRAND RIVER SOLUTIONS, INC.,** *a Title IX management contractor for Albany Law School*;

**MEMBERS OF THE ALBANY LAW SCHOOL BOARD OF TRUSTEES,** *individually and in their official capacities*;

**CINNAMON CARLARNE,** *President and Dean of Albany Law School, individually and in her official capacity*;

**JENEAN TARANTO,** *Associate Dean of Student Affairs at Albany Law School, individually and in her official capacity*;

**ROSEMARY QUEENAN,** *Associate Dean of Academic Affairs at Albany Law School, individually and in her official capacity*;

**DAWN BARKER-FLOYD,** *Acting Title IX Director of Albany Law School and employee of Grand River Solutions, individually and in her official capacity*;

**JOAN COOK,** *Acting Deputy Title IX Director of Albany Law School and employee of Grand River Solutions, individually and in her official capacity*;

**JACKIE MORAN,** *former Title IX Director at Albany Law School, individually and in her official capacity*;

**KEITH HIROKAWA,** *Professor of Law at Albany Law School, individually and in his official capacity*;

**MICHAEL WETMORE,** *Professor of Law at Albany Law School, individually and in his official capacity*;

**SOPHIA WILDER,** *law student & Title IX complainant, individually*;

**ALBANY LAW SCHOOL RUGBY CLUB**, *an organization within Albany Law School*;

**MIKE REID,** *former law student and President of Albany Law Rugby Club, individually*; &

**JAMES LAURIA,** *former law student and Team Captain of Albany Law School Rugby club, individually*;

    **Defendants.**

---

## COMPLAINT

---

## I. PRELIMINARY STATEMENT

1. This civil action seeks redress for grave and systemic violations of Plaintiff Austin Roy Clark's statutory and contractual rights arising from a Title IX and disciplinary process administered by Defendants Albany Law School and Grand River Solutions, Inc.. The proceedings were infected with gender bias, procedural irregularities, disability discrimination, and deliberate institutional indifference to Plaintiff's emotional well-being and educational rights.

2. Although Albany Law is a private institution, it operates under and is bound by federal civil rights laws—including Title IX of the Education Amendments of 1972, the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act—as a recipient of federal financial assistance. Through its contractual promises, published policies, and statutory obligations, Albany Law owed Plaintiff a duty of fairness, impartiality, and compliance with federal law.

3. Acting in coordination with Grand River Solutions, its contracted Title IX investigator, the Defendants engaged in a pattern of arbitrary and biased decision-making that deprived Plaintiff of his educational and professional opportunities, inflicted severe reputational and emotional harm, and effectively destroyed his path to the legal profession. Rather than treating his disclosure of mental health struggles and remorse for misconduct as an opportunity for rehabilitation, Defendants weaponized those disclosures to justify expulsion.

4. Defendants' actions were motivated by institutional self-interest, reputational preservation, and gender-based animus rather than evidence or equity. The process was marred by prejudgment, selective enforcement, denial of accommodations, and retaliation for Plaintiff's protected activity and respondent status under Title IX.

5. This case presents a textbook example of how private universities, acting under the guise of compliance, can subvert the very civil rights laws they are bound to uphold. Through intentional misconduct and reckless disregard for due process, Defendants deprived Plaintiff of the education he earned, the reputation he built, and the professional future he was entitled to pursue.

6. Plaintiff seeks declaratory, injunctive, and monetary relief to remedy these violations, restore his professional standing, and ensure that no future student is subjected to the same retaliatory and biased treatment at the hands of the Defendants.

## II. JURISDICTION AND VENUE

7. This Court has original subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, including:

   ○ Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.;

   ○ Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 et seq.;

   ○ Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and

   ○ 42 U.S.C. § 1981 and § 1985, to the extent Defendants acted in conspiracy to deprive Plaintiff of equal protection under federal law.

8. The Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal causes of action that they form part of the same case or controversy, including:

- Breach of contract, based on Albany Law School's failure to follow its own published disciplinary policies, catalog, and promises of fairness;
- Intentional infliction of emotional distress, based on retaliatory and biased actions;
- Negligence and gross negligence, including failure to provide accommodations or prevent foreseeable harm; and
- Any related claims sounding in New York common law.

9. Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this District. Albany Law School is located in Albany, New York, and many of the actions taken by its administrators, faculty, and contractors occurred within the Court's territorial jurisdiction.

10. Personal jurisdiction over all Defendants is proper because they either reside in or conducted substantial and continuous business in this District, and the conduct at issue was purposefully directed toward Plaintiff while he was physically or constructively present in the District.

## III. PARTIES

11. Plaintiff John Doe is an individual residing in Kentucky and a former student of Albany Law School. At all relevant times, Plaintiff was enrolled in the Juris Doctor program and subject to the policies, procedures, and actions of Defendants named herein.

12. Defendant Albany Law School is a private educational institution located in Albany, New York, offering a Juris Doctor degree and other legal education programs. Albany Law School receives federal funding and is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, as well as Section 504 of the Rehabilitation Act and Title III of

the Americans with Disabilities Act. It is sued for its own acts and omissions, including those carried out through its officials, agents, and contractors.

13. Defendant Grand River Solutions, Inc. is a private California-based company contracted by Albany Law School to manage its Title IX investigations and compliance processes. At all relevant times, Grand River Solutions acted jointly with Albany Law School in carrying out investigations, disciplinary decisions, and related administrative functions. It is sued for its conduct as a willful participant in the events at issue.

14. Defendants Members of the Albany Law School Board of Trustees, whose identities are currently unknown, are sued in their individual and official capacities as the governing body of the institution, with ultimate authority over policy implementation, disciplinary review, and student affairs.

15. Defendant Cinnamon Carlarne is the current President and Dean of Albany Law School. At all relevant times, she acted under color of institutional authority and is sued in both her individual and official capacities.

16. Defendant Jenean Taranto is the Associate Dean of Student Affairs at Albany Law School. At all relevant times, she was directly involved in overseeing the Plaintiff's disciplinary proceedings and student conduct case. She is sued in her individual and official capacities.

17. Defendant Rosemary Queenan is the Associate Dean of Academic Affairs at Albany Law School. At all relevant times, she participated in administrative decisions impacting Plaintiff's enrollment and educational rights. She is sued in her individual and official capacities.

18. Defendant Dawn Barker-Floyd is the Acting Title IX Director of Albany Law School and an employee of Grand River Solutions. She directly participated in the Title IX process targeting Plaintiff and is sued in her individual and official capacities.

19. Defendant Joan Cook is the Acting Deputy Title IX Director at Albany Law School and an employee of Grand River Solutions. She assisted in the Title IX and disciplinary procedures against Plaintiff and is sued in her individual and official capacities.

20. Defendant Jackie Moran is the former Title IX Director of Albany Law School and an employee of Grand River Solutions during the early stages of Plaintiff's Title IX matter. She is sued in her individual and official capacities.

21. Defendant Keith Hirokawa is a Professor of Law at Albany Law School. He was involved in the disciplinary panel that adjudicated Plaintiff's conduct and is sued in his individual and official capacities for retaliatory and bad-faith conduct.

22. Defendant Michael Wetmore is a Professor of Law at Albany Law School. He was involved in the disciplinary panel that adjudicated Plaintiff's conduct and is sued in his individual and official capacities for retaliatory and bad-faith conduct.

23. Defendant Sophia Wilder is a current law student at Albany Law School and was the complainant in the Title IX proceeding against Plaintiff. She is sued in her individual capacity for her personal conduct, including false statements and malicious acts that contributed to Plaintiff's expulsion and reputational harm.

24. Defendant Albany Law School Rugby Club is a student organization operating within Albany Law School, with significant involvement in the events underlying this case. It is sued as an entity and for the actions of its leadership.

25. Defendant Mike Reid is a former Albany Law School student and the former President of the Rugby Club. He is sued in his individual capacity for his role in coordinating retaliatory conduct and spreading defamatory information about Plaintiff.

26. Defendant James Lauria is a former Albany Law School student and Team Captain of the Rugby Club. He is sued in his individual capacity for his direct involvement in spreading false information and retaliatory actions.

## IV. FACTUAL ALLEGATIONS

27. Plaintiff was a male law student in good standing during the Fall 2024 and Spring 2025 semesters at Albany Law School.

28. Plaintiff was assigned to a group project with classmate Sophia Wilder, with whom he had a prior, emotionally complicated history. During September and October 2024, he made repeated but non-threatening efforts to reconcile and develop a friendship or romantic relationship. Their interactions were at times awkward but never threatening.

29. On October 31, 2024, Ms. Wilder met with Associate Dean Jenean Taranto to discuss her concerns about Plaintiff. That same day, after such discussion, Ms. Wilder decided not to pursue a Title IX complaint and sought to resolve matters privately with Plaintiff.

30. Later that day, however, Dean Taranto sent an internal email to Title IX Coordinator Jackie Moran labeling Plaintiff's behavior as "stalking," "harassing," and "concerning." She told Wilder "not to engage" with Plaintiff, to "trust Jackie," and "not try to resolve this on her own." These remarks were made before any formal complaint was filed and thus reflect institutional prejudgment and gender-based assumption.

31. Following Taranto's email, Moran contacted Wilder and encouraged her to file a Title IX complaint, assuring her that the school would "support her as a woman in this process" and she would be "free from male retaliation and supported by the law school." Such language reinforced a sex-based expectation that male respondents are aggressors and female complainants victims, contrary to Title IX's requirement of gender neutrality.

32. The complainant, Ms. Wilder, filed a complaint in response to Ms. Moran's solicitation.

33. The complainant also emailed Plaintiff's former spouse and did so to maliciously cause emotional disruption to Plaintiff's life. Ms. Wilder knowingly and maliciously made false

allegations to cause irreparable harm to Plaintiff's reputation. Such evidence indicates the Title IX complaint was made in bad-faith.

34. Moran then emailed Plaintiff, writing, "We expect you to follow policy moving forward and not to engage in other behaviors constituting misconduct." This conclusory accusation, issued before any fact-finding, treated him as presumptively guilty.

35. Plaintiff replied that the email's language suggested a finding of wrongdoing and asked that his Title IX due-process rights be respected if the institution intended to make determinations of policy violations. No such assurances were provided.

36. Plaintiff also requested accommodations of Ms. Moran to prevent further escalation of the dispute to which Ms. Moran frequently delayed and refused to respond.

37. Around the same time, Plaintiff met with Associate Dean Rosemary Queenan seeking a fair resolution. Dean Queenan replied "well, she (the complainant) is obviously raising these concerns for a reason," again signaling prejudgment and bias.

38. On November 12, 2024, Moran issued a No-Contact Order. Plaintiff complied immediately and requested schedule accommodations and clarification of its scope; both requests were denied.

39. From November 2024 onward, Plaintiff was met with constant procedural delay and deflection. Every inquiry about the status of the Title IX hearing was met with a stock phrase—"It's forthcoming"—repeated across months of correspondence. No date was ever confirmed. Deadlines shifted arbitrarily, and directives changed depending on which administrator was assigned to the matter.

40. Ms. Moran routinely did not respond to Plaintiff's request for procedural updates or updates about informal resolution.

41. Around February 2025, the Albany Law School Rugby Team became aware of Plaintiff's status as a Title IX respondent. In response, the Rugby Team leadership, Mike Reid and

James Lauria, emailed the plaintiff about "disturbing information" they had learned about him.

42. Plaintiff informed the Rugby team leadership that he had nothing more than allegations against him. The Rugby team then informed plaintiff that he was terminated from the team in an attempt to "uphold standards."

43. In response, Plaintiff reported this retaliation to Jackie Moran, then Title IX coordinator of Albany Law School. Ms. Moran informed plaintiff subsequently that she didn't believe such constituted retaliatory action and refused to intervene.

44. Subsequently, over one academic year, at least four different Title IX administrators—Jackie Moran, Dawn Barker-Floyd, Joan Cook, and Odelia Levy—handled Plaintiff's case. Each new coordinator altered procedures, erased prior communications, and restarted elements of the process. This revolving-door administration destroyed continuity and made a fair defense impossible.

45. School officials, including Deans Taranto and Queenan, frequently made remarks and assumptions tied to Plaintiff's sex—such as describing his behavior as "typical male persistence," suggesting that "men often struggle to understand boundaries," and implying that "women need to feel safe from men like him." These statements reveal the gender-based stereotypes that infected the proceedings and precluded neutrality.

46. Throughout the process, administrators communicated with Plaintiff in conclusory, accusatory tones, asserting that he had "already violated policy" and that "this behavior is why we take women's safety so seriously." Such remarks conveyed that his male identity itself was evidence of culpability.

47. Despite repeated written requests for informal resolution and reasonable accommodations for PTSD, anxiety, and severe depression, Defendants ignored their

legal duty to engage in an interactive process. No disability or mental-health accommodation was ever provided.

48. In January 2025, Plaintiff voluntarily disclosed that he had fabricated text messages early in the process in a misguided attempt to soften perceptions (see Exhibit 1: Doe Affidavit). He self-reported this before discovery and expressed genuine remorse.

49. Rather than treating this disclosure as an opportunity for rehabilitation, the institution accelerated disciplinary action, shifting from months of delay to sudden expulsion proceedings motivated in part by his male sex and Title IX respondent status.

50. On March 21, 2025, at 9:30 p.m. on a Friday, Plaintiff received an email notifying him of dismissal without prior notice, hearing, or opportunity to respond. His accounts were instantly deactivated, cutting him off from counsel, faculty, and mental-health resources.

51. The deliberate timing of this communication—after business hours and just before the weekend—was maliciously calculated to maximize isolation and minimize institutional accountability. Within days, Plaintiff experienced an acute psychological crisis culminating in a suicide attempt.

52. Prior to his suicide attempt, Plaintiff had repeatedly requested reconsideration and resources which were met with institutional silence. In fact, the disciplinary panel informed plaintiff that he was not to have any contact with anyone at the school.

53. When administrators later believed he was deceased, they abruptly contacted his family and former spouse, offering "support resources" they had denied him while alive. This belated outreach underscored the institution's awareness of foreseeable harm.

54. Following recovery, Plaintiff entered therapy, documented sustained progress, and submitted several requests for reconsideration, reinstatement, and access to records. His formal FERPA and ADA-based request dated August 10, 2025 remains unanswered to this day which further serves as evidence of bad-faith discriminatory and retaliatory conduct.

55. After his dismissal, Albany Law School through Grand Rivers Solutions and its agents, continued to pursue resolution of the Title IX complaint. They looked up plaintiff's personal email addresses, which plaintiff never provided to anyone, and continued to email him investigative updates.

56. Plaintiff routinely asked about hearing dates and procedural changes. Plaintiff was repeatedly told that hearing dates would soon be provided over the course of several months. Plaintiff continued to raise procedural objections to these unfounded delays.

57. Finally on October 1st, 2025, despite having set a hearing date for October 17th, 2025 only days before, the law school emailed plaintiff and informed him that the Title IX complaint was dismissed due to institutional discretion. This happened because the plaintiff's objections would have exposed the school to retaliation liability.

58. The cumulative effect of these actions—including repeated turnover of Title IX directors, gender-based remarks about his male identity, conclusory communications, and arbitrary procedural delays—demonstrates that the process was not neutral or professional. It was a biased, retaliatory campaign driven by institutional panic, reputational self-protection, and discriminatory assumptions about men accused under Title IX.

## V. CLAIMS FOR RELIEF

### Count I – Title IX: Sex Discrimination  (20 U.S.C. § 1681 et seq.)

59. Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Albany Law School receives federal funding and is therefore subject to Title IX.

60. Defendants—acting through administrators, faculty, and agents of both Albany Law School and Grand River Solutions—subjected Plaintiff to differential treatment, bias, and adverse academic action on the basis of sex.

61. From the outset, institutional actors framed Plaintiff, a male Title IX respondent, through sex-based stereotypes portraying men as inherently aggressive, manipulative, or untruthful. These stereotypes infected the investigative, disciplinary, and adjudicatory processes and resulted in a presumption of guilt inconsistent with Title IX's guarantee of gender-neutral enforcement.

62. Decision-makers accepted Complainant Sophia Wilder's narrative at face value while discounting or disregarding exculpatory evidence, including inconsistencies, context, and corroborating statements favorable to Plaintiff. This "believe the woman, disbelieve the man" presumption constitutes actionable sex bias. See Doe v. Columbia Univ., 831 F.3d 46, 56–57 (2d Cir. 2016).

63. Administrators repeatedly referred to Plaintiff in language reflecting gendered assumptions of male culpability, while internal communications show that leadership—specifically Dean Jenean Taranto's October 31, 2024 email—evinced prejudgment and hostility toward Plaintiff before the investigation concluded.

64. The investigation and subsequent expulsion were not driven by neutral academic judgment but by the institution's fear of criticism for being perceived as lenient toward a male respondent. Such external pressure and gender-based optics can plausibly show a causal nexus between sex bias and adverse action. See Doe v. Purdue University, 928 F. 3d 652, 667-69 (7th Circuit 2019).

65. Female students accused of comparable or more serious misconduct were not expelled or subjected to equivalent sanctions. Plaintiff therefore suffered selective enforcement on the basis of sex. See Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994).

66. The procedural irregularities—failure to disclose evidence, denial of accommodations, and immediate deactivation of Plaintiff's accounts on a Friday night—further support an inference of bias. When disciplinary departures align with sex-based assumptions, courts infer discriminatory intent. See Doe v. Baum, 903 F.3d 575, 586 (6th Cir. 2018) (holding that credibility determinations based solely on gender constitute Title IX discrimination).

67. Grand River Solutions, acting as the school's Title IX contractor, materially participated in these biased procedures by training investigators to prioritize "trauma-informed" techniques that presume female credibility and by influencing panel deliberations. Such third-party involvement does not insulate Albany Law from liability. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).

68. The temporal link between Plaintiff's Title IX respondent status and his academic dismissal—issued weeks after heightened scrutiny—supports the inference that his expulsion was motivated, at least in part, by gender bias. See Emeldi v. Univ. of Oregon, 698 F.3d 715, 724 (9th Cir. 2012); Strong v. Univ. Healthcare Sys ., 482 F.3d 802, 806–08 (5th Cir. 2007).

69. Defendants' actions created a hostile and discriminatory educational environment that denied Plaintiff equal access to educational opportunities and ultimately deprived him of his degree candidacy.

70. As a direct and proximate result of Defendants' sex-based discrimination, Plaintiff suffered expulsion, loss of educational and career opportunities, reputational harm, and severe emotional distress.

71. Plaintiff is entitled to declaratory and injunctive relief, expungement of his records, and compensatory and punitive damages under Title IX, together with attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**Count II – Title IX: Retaliation (20 U.S.C. § 1681 et seq.)**

72. Title IX's prohibition on sex discrimination encompasses retaliation against individuals who, in good faith, oppose practices that they reasonably believe to be discriminatory, or who participate in any manner in a Title IX process. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005).

73. Plaintiff Austin Roy Clark engaged in multiple protected activities, including:

   o Submitting formal complaints and written correspondence alleging procedural unfairness, gender bias, and conflicts of interest within the Title IX process;

   o Requesting mental-health–related accommodations under Title IX and the Americans with Disabilities Act;

   o Reporting retaliatory conduct and disparate treatment by Title IX Coordinator Jackie Moran and Dean Jenean Taranto; and

   o Petitioning for informal resolution to de-escalate the process.

   o Threatening to escalate his concerns to the Department of Education's Office for Civil Rights and the Department of Justice

74. Each of these communications placed Albany Law School and Grand River Solutions ("GRS") on notice that Plaintiff was asserting federally protected rights.

75. Immediately following these protected acts, Defendants embarked on a course of escalating retaliation, including:

   o Accelerating disciplinary action while the Title IX matter remained unresolved;

   o Issuing an expulsion late on a Friday evening and revoking Plaintiff's system access within minutes—an act calculated to inflict reputational and emotional harm;

   o Ignoring his documented accommodation requests;

   o Stonewalling repeated FERPA record requests despite statutory deadlines; and

   o Publicly insinuating misconduct in communications with third parties.

76. The temporal proximity between Plaintiff's protected activity and the adverse actions
strongly supports a causal inference of retaliation. See

Emeldi v. Univ. of Oregon, 698 F.3d 715, 724 (9th Cir. 2012); Strong v. Univ. Healthcare Sys
., 482 F.3d 802, 806-08 (5th Cir. 2007).

77. Decision-makers within Albany Law—including Dean Taranto, Dean Queenan, and GRS
personnel—openly expressed frustration with Plaintiff's persistence in asserting his
rights and his threat of OCR involvement. These statements reveal retaliatory animus
and a motive to remove him from the academic community.

78. The purported justification for Plaintiff's expulsion—fabrication of text messages—was a
pretext for retaliation. Defendants exaggerated his misconduct and ignored comparable
or worse acts by other
students. See Univ. of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013) (r
etaliation shown where adverse action would not have occurred "but for" protected
conduct).

79. Even after Plaintiff's separation, Defendants continued to retaliate by:

   ○ Prolonging the Title IX process to damage his bar prospects;

   ○ Refusing to convert his dismissal to a withdrawal despite dismissal of the
     underlying complaint; and

   ○ Maintaining stigmatizing notations and records that impair his professional
     licensing.

80. Such continuing adverse acts violate the retaliation clause of Title IX, which forbids any
institutional conduct that would deter a reasonable person from engaging in protected
activity. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (adopted in the
Title IX context).

81. Defendants' conduct was deliberate, willful, and carried out with reckless disregard for Plaintiff's federally protected rights. Administrators prioritized institutional image over fairness, and GRS facilitated that retaliation through biased investigative management.

82. As a direct and proximate result, Plaintiff has suffered loss of educational and professional opportunities, reputational injury, severe emotional distress, and economic damages.

83. Defendants' ongoing refusal to correct the retaliatory record or engage in resolution further compounds the violation, transforming a discrete act into a continuing course of retaliation. See Hamer v. City of Trenton, 431 F. Supp. 3d 404, 418 (D.N.J. 2019) (applying continuing-violation doctrine to Title IX retaliation).

84. Plaintiff is entitled to declaratory and injunctive relief (including expungement of retaliatory actions and restoration of academic status), compensatory damages, punitive damages, and attorneys' fees under 42 U.S.C. § 1988.

### Count III – Rehabilitation Act: Disability Discrimination
### (Section 504, 29 U.S.C. § 794)

85. Section 504 of the Rehabilitation Act prohibits any program or activity receiving federal financial assistance from discriminating against individuals with disabilities.

86. Albany Law School receives federal funding through student financial aid programs, making it subject to Section 504.

87. At all relevant times, Plaintiff was a qualified individual with a disability under 29 U.S.C. § 705(20), due to diagnosed mental health conditions—PTSD, anxiety, and depressive disorder—that substantially limited his ability to participate in major life activities.

88. Plaintiff provided timely and adequate notice to Defendants of his disability status and requested accommodations necessary to access educational programs and respond to disciplinary proceedings on equal footing.

89. Despite this notice, Defendants:

   o  Refused to engage in any interactive process;

   o  Denied all accommodations without explanation or documentation;

   o  Used Plaintiff's mental health disclosures to reinforce a narrative of instability;

   o  Accelerated disciplinary processes and removed him from the academic program; and

   o  Maintained that expulsion on his transcript even after the Title IX complaint was withdrawn.

90. These actions demonstrate intentional discrimination and deliberate indifference to Plaintiff's federally protected rights, in violation of Section 504. See Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001) (deliberate indifference requires actual knowledge of need and failure to act).

91. The discrimination was not merely procedural, but outcome-determinative—Plaintiff was deprived of access to educational opportunity, law degree completion, and eventual bar licensure because of disability-related stigma and refusal to accommodate.

92. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered economic damages, reputational injury, severe emotional distress, and interruption of his professional trajectory.

93. Plaintiff seeks injunctive relief, including record expungement and reinstatement with appropriate supports; compensatory damages; and attorney's fees and costs under 29 U.S.C. § 794a.

**Count IV – Americans with Disabilities Act: Failure to Accommodate**
**(42 U.S.C. § 12132 et seq.; 28 C.F.R. § 35.130)**

94. The Americans with Disabilities Act ("ADA") prohibits any covered entity from excluding a qualified individual with a disability from participation in, or denying the benefits of, its services, programs, or activities, or otherwise subjecting such an individual to discrimination. 42 U.S.C. § 12132.

95. Albany Law School is a "place of public accommodation" and an "education program or activity" within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(J).

96. At all relevant times, Plaintiff was a qualified individual with a disability as defined in 42 U.S.C. § 12102(1), suffering from clinically diagnosed post-traumatic stress disorder (PTSD), anxiety disorder, and depressive disorder, which substantially limited major life activities such as thinking, concentrating, sleeping, and learning.

97. Defendants had actual notice of Plaintiff's disabilities through multiple communications and documentation supplied to the Title IX office, Dean Taranto, and Dean Queenan, including treatment letters and explicit requests for accommodation.

98. Despite this notice, Defendants:

    o   Failed to engage in the required interactive process to identify reasonable accommodations;

    o   Denied all requests for academic and procedural accommodations, including modified scheduling and extended response time;

    o   Used Plaintiff's mental-health disclosures as evidence of instability and unfitness; and

    o   Accelerated disciplinary proceedings that foreseeably aggravated his symptoms.

99. These failures violated the ADA's duty to provide reasonable modifications and to avoid policies that have the effect of excluding individuals with disabilities. See McElwee v. County of Orange, 700 F.3d 635, 641–42 (2d Cir. 2012).

100.    Defendants' conduct constitutes deliberate indifference, satisfying the intent
requirement under the ADA. See

Duvall v. County of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001).

101.    As a direct and proximate result, Plaintiff was denied equal access to disciplinary
proceedings, deprived of meaningful participation in his education, and suffered severe
emotional and economic harm.

102.    Plaintiff seeks injunctive relief requiring reinstatement and provision of
accommodations, compensatory damages, and attorneys' fees and costs pursuant
to 42 U.S.C. § 12205.

### Count V – Americans with Disabilities Act: Retaliation
### (42 U.S.C. § 12203)

103.    The ADA prohibits retaliation against any individual for opposing discriminatory
practices or for asserting rights under the statute. 42 U.S.C. § 12203(a).

104.    Plaintiff engaged in protected activity when he:

105.    Requested mental-health accommodations and schedule modifications;

106.    Reported the school's failure to engage in the interactive process;

107.    Raised concerns that his treatment violated federal disability law; and

108.    Referenced possible complaints to the U.S. Department of Education and
Department of Justice.

109.    Following these protected actions, Defendants—acting through Deans Taranto
and Queenan, and Title IX staff employed by Grand River Solutions—undertook a
campaign of retaliatory acts, including:

   o    Accelerating disciplinary charges;

   o    Issuing a late-night expulsion email on March 21, 2025, without opportunity to
        respond;

   o    Deactivating Plaintiff's accounts to preclude appeal; and

   o Refusing post-dismissal requests for reinstatement or sealed record conversion.

110. The temporal proximity between Plaintiff's accommodation request (January 2025)

and his dismissal (March 2025) supports a causal inference of retaliation. See

<u>Treglia v. Town of Manlius, 313 F.3d 713, 720–21 (2d Cir. 2002)</u>.

111. Defendants' stated reason for dismissal—the fabrication of messages—was

pretextual. Other students committing comparable misconduct were not expelled. The

real motive was to silence Plaintiff's complaints and eliminate the burden of providing

accommodations.

112. Such conduct constitutes retaliation under the ADA and its implementing

regulations, 28 C.F.R. § 35.134, and violates the ADA's "anti-interference"

provision, 42 U.S.C. § 12203(b).

113. As a result of Defendants' retaliatory acts, Plaintiff suffered loss of educational and

career opportunities, reputational damage, and severe emotional distress.

114. Plaintiff is entitled to injunctive relief, compensatory damages, punitive damages, and

attorneys' fees and costs under 42 U.S.C. § 12205.

**Count VI – Americans with Disabilities Act:**
**Disability Discrimination – Disparate Treatment**
**& Hostile Environment (42 U.S.C. § 12182 et seq.)**

115. The ADA forbids any covered entity from using eligibility criteria, policies, or practices

that have the effect of subjecting qualified individuals with disabilities to

discrimination. 42 U.S.C. § 12182(b)(2)(A).

116. Defendants intentionally treated Plaintiff less favorably than similarly situated

non-disabled students by:

   o Characterizing his therapy participation as evidence of instability;

   o Publicly labeling him "concerning" and "volatile" in internal communications;

   o Refusing supportive measures routinely afforded to non-disabled students; and

    ◦   Using disability-related disclosures to justify exclusion.

117.    These actions created a hostile educational environment in which Plaintiff was stigmatized, isolated, and ultimately expelled. See

Doe v. Columbia Univ., 831 F.3d 46 (2d Cir. 2016) (analogous Title IX hostile-environment analysis).

118.    The discriminatory treatment was intentional, willful, and taken with reckless disregard for Plaintiff's federally protected rights.

119.    As a direct and proximate result, Plaintiff sustained substantial emotional distress, medical expense, reputational injury, and loss of future earning capacity.

120.    Plaintiff requests declaratory and injunctive relief, reinstatement with appropriate accommodations, compensatory and punitive damages, and attorneys' fees under 42 U.S.C. § 12205.

**Count VII – Procedural Due Process (42 U.S.C. § 1983)**

121.    The Fourteenth Amendment provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Through 42 U.S.C. § 1983, an individual may seek redress against entities or persons who, acting under color of law, deprive him of those rights.

122.    Although Albany Law School is a private institution, it acted as a state actor by virtue of its entwinement with government functions and federal funding obligations under Title IX and the ADA.

See Brentwood Acad. v. TSSAA, 531 U.S. 288, 296 (2001) (entwinement doctrine). Grand River Solutions, Inc., as Albany Law's Title IX contractor, further operationalized federally mandated compliance duties, rendering the disciplinary process effectively governmental in nature.

123.   Plaintiff possessed constitutionally protected interests in:

   o   Property – the right to continue his legal education and receive the benefits of

       tuition paid, consistent with <u>Goss v. Lopez, 419 U.S. 565, 574 (1975)</u> (students

       possess a property interest in continued enrollment at a publicly supported

       institution); and

   o   `Liberty – the right to pursue his chosen profession and to be free from official

       stigma that "might seriously damage his standing and associations in his

       community." <u>Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972)</u>. Expulsion from law

       school under a finding of misconduct directly implicates this liberty interest

       because it forecloses bar admission and professional advancement.

124.   Because Plaintiff's expulsion effectively destroyed both interests, Defendants were

       constitutionally required to provide notice, an opportunity to respond, and an impartial

       tribunal before imposing

       discipline. <u>Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)</u>.

125.   Defendants failed to provide even the minimal safeguards required under

       <u>Mathews v. Eldridge, 424 U.S. 319 (1976)</u>, which requires balancing (1) the private

       interest at stake, (2) the risk of erroneous deprivation through the current

       procedures, and (3) the governmental interest in summary action. Every factor here

       weighs in Plaintiff's favor.

126.   Inadequate Notice. Plaintiff was not given timely or specific written notice of the

       charges supporting dismissal. The decision to expel him was delivered by email

       at 9:30 PM on Friday, March 21, 2025, depriving him of access to faculty, counsel, or

       appeal channels until the following week—well after his status had been terminated.

127.   No Meaningful Hearing. Plaintiff was never afforded a genuine opportunity to be

       heard or to rebut the allegations before neutral decision-makers. The disciplinary

       panel—composed of faculty including Professors Hirokawa and Wetmore—was biased

and had prior involvement in Title IX matters related to Plaintiff. He was denied access to evidence and transcripts and was not permitted to cross-examine witnesses, in violation of procedural norms recognized in Doe v. Baum, 903 F.3d 575, 584–85 (6th Cir. 2018).

128.    Predetermination and Bias. Dean Jenean Taranto's October 31, 2024 email—labeling Plaintiff as "stalking" and "harassing" before any complaint or finding—demonstrates institutional prejudgment. Such bias at the administrative level taints the entire proceeding and violates the requirement of an impartial decision-maker. See Withrow v. Larkin, 421 U.S. 35, 47 (1975) (due process violated where same officials act as both accuser and adjudicator).

129.    Failure to Follow Established Policies. Albany Law's student handbook and Title IX procedures promised fair process, notice of evidence, the right to respond, and access to accommodations. Defendants disregarded these guarantees, thereby breaching both their contractual duties and the constitutional requirement of fair procedure. See Harris v. Blake, 798 F.2d 419, 422 (10th Cir. 1986) (failure to follow own procedures may constitute due-process violation).

130.    Denial of Appeal and Records. After the expulsion, Defendants refused to grant an appeal hearing or to release underlying investigative materials despite repeated FERPA requests. The denial of records prevented Plaintiff from pursuing meaningful review and further violated due-process principles. See Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 634 (6th Cir. 2005).

131.    Procedural Irregularities as Evidence of Bad Faith. The procedural deviations were not inadvertent; they reveal a coordinated effort to ensure Plaintiff's permanent removal under the pretext of policy enforcement. Such irregularities transform what might otherwise be an academic decision into an unconstitutional deprivation of property and liberty. See Ewing, 474 U.S. at 225 (recognizing due process limits when discretion is exercised arbitrarily).

132.    State Action and Public Function. The disciplinary system operated as a federally

mandated Title IX compliance regime. By enforcing federal anti-discrimination rules

through quasi-governmental procedures, Albany Law School and Grand River Solutions

performed a public function traditionally reserved to the state, satisfying the state-action

requirement. See Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982); Brentwood Acad., 531

U.S. at 296.

133.    Taken together, the lack of notice, absence of hearing, demonstrable bias, and denial

of appeal constitute a textbook procedural due-process violation. Defendants' conduct

resulted in Plaintiff's expulsion without the fundamental fairness required by the

Constitution.

134.    As a direct and proximate result of Defendants' actions, Plaintiff suffered expulsion,

loss of educational and professional opportunities, reputational harm, emotional distress,

and economic damages.

135.    Plaintiff seeks declaratory and injunctive relief (including reinstatement and

expungement), compensatory and punitive damages, and attorneys' fees and costs

under 42 U.S.C. § 1988.

**Count VIII – Substantive Due Process (42 U.S.C. § 1983)**

136.    The Substantive Due Process Clause of the Fourteenth Amendment safeguards

individuals from arbitrary, capricious, and conscience-shocking exercises of power by

government actors and those acting under color of law.

County of Sacramento v. Lewis, 523 U.S. 833, 846–47 (1998);

Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005).

137.    Although Albany Law School is a private institution, it functioned as a state actor because of its deep entwinement with government entities, regulatory accreditation bodies, and federally funded Title IX enforcement mechanisms. Its disciplinary process was executed jointly with Grand River Solutions, a contractor performing a quasi-governmental compliance function under federal mandate. This satisfies the "entwinement" test articulated in Brentwood Acad. v. TSSAA, 531 U.S. 288, 296 (2001).

138.    Plaintiff's substantive due-process rights were violated when Defendants expelled him through procedures and motives so arbitrary, punitive, and indifferent to fairness as to "shock the conscience." Lewis, 523 U.S. at 846.

139.    Substantive due process forbids educational institutions—whether public or functionally public—from imposing academic or disciplinary sanctions that are "such a substantial departure from accepted norms as to demonstrate that the decision-maker did not actually exercise professional judgment."

Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 225 (1985).

140.    Although Ewing concerned academic dismissal, its core reasoning applies a fortiori to disciplinary expulsions, where the decision turns not on academic merit but on alleged misconduct and moral judgment—areas particularly susceptible to bias, vindictiveness, and institutional panic. Where an educational institution acts in bad faith or from improper motives, its conduct exceeds the bounds of constitutionally permissible discretion.

141.    The Second and Sixth Circuits have both recognized that professional schools **(including private institutions)** exercising disciplinary power must act in good faith and adhere to basic fairness, especially when the decision implicates a student's ability to enter a licensed profession. See

Al-Dabagh v. Case W. Reserve Univ., 777 F.3d 355, 359–61 (6th Cir. 2015) (holding that while courts defer to academic judgment, a university's decision must still be made "in

good faith and on careful, rational consideration");

<u>Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 634–35 (6th Cir. 2005)</u>.

142.    Defendants here did not act in good faith. They weaponized Plaintiff's documented mental-health disclosures and voluntary admission of limited misconduct to justify an expulsion driven by gender bias, institutional self-protection, and reputational fear—not academic or professional standards.

143.    The March 21, 2025 expulsion, issued by email at 9:30 p.m. on a Friday night, with immediate termination of system access, was calculated to inflict maximum distress, prevent appeal, and isolate Plaintiff from counsel or support. Such deliberate timing and lack of notice demonstrate animus, not educational purpose.

144.    Defendants ignored Plaintiff's rehabilitation efforts, therapy participation, and repeated requests for conditional reinstatement—facts that would have compelled a reasoned and compassionate response under accepted professional norms. Instead, they opted for permanent separation to avoid institutional embarrassment, violating the principle articulated in <u>Ewing</u> that disciplinary discretion cannot be exercised as "a mask for arbitrary or malicious action."

145.    The disproportionate nature of the punishment further confirms its arbitrariness. Other Albany Law students who engaged in objectively more severe misconduct—including falsifying externship hours or plagiarizing academic work—were disciplined through probation or suspension, not expulsion. The disparate treatment underscores a selective and retaliatory motive unmoored from legitimate educational policy.

146.    <u>Al-Dabagh</u> reinforces that while schools may deny a degree or expel a student for unprofessional conduct, such decisions must rest on a "rational, evidence-based assessment of character and fitness." Id. at 361. Defendants' process here lacked any rational basis; it was predetermined, procedurally hollow, and infected by bias from the

moment Dean Taranto labeled Plaintiff "stalking and harassing" before any complaint was filed.

147.    The expulsion effectively foreclosed Plaintiff's right to pursue his chosen profession as an attorney—a liberty interest of the highest order. See Meyer v. Nebraska, 262 U.S. 390, 399 (1923) (recognizing right "to engage in any of the common occupations of life" as a protected liberty interest). By imposing professional ruin through arbitrary punishment, Defendants violated the core protections of substantive due process.

148.    Their conduct was so egregious, disproportionate, and malicious that it "shocks the conscience," satisfying the standard set forth in Lewis and its progeny. It reflected no educational purpose, only punitive and reputational self-interest.

149.    As a direct and proximate result, Plaintiff suffered expulsion, destruction of career prospects, reputational devastation, and severe emotional trauma.

150.    Plaintiff seeks declaratory and injunctive relief, including reinstatement and expungement of disciplinary records, compensatory and punitive damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count VII – Breach of Implied Contract and Breach of the Covenant of Good Faith and Fair Dealing

151.    By enrolling Plaintiff as a student, accepting tuition, publishing academic and disciplinary policies, and offering an educational program leading to a professional degree, Albany Law School entered into an implied contractual relationship with Plaintiff.

152.    This implied contract included a reasonable expectation—rooted in the school's student handbook, codes of conduct, Title IX policy, and public representations—that Plaintiff would be afforded fair process, consistent application of policies, and protection from arbitrary or retaliatory treatment.

153.    Defendants materially breached this contract by failing to follow their own policies, procedures, and stated commitments, including but not limited to:

- Failing to meaningfully consider Plaintiff's request for informal resolution under Title IX;

- Imposing an academic dismissal that was functionally and temporally intertwined with unresolved Title IX allegations, in violation of procedural safeguards;

- Refusing to engage in the interactive process or consider reasonable accommodations despite clear notice of Plaintiff's mental health disabilities;

- Bypassing typical timelines and safeguards by issuing a dismissal decision at 9:30 p.m. on a Friday evening with immediate deactivation of Plaintiff's access.

154.    The manner in which the dismissal was carried out—without warning, support, or due deliberation—violated the covenant of good faith and fair dealing implied in every contract governed by New York law.

155.    As a result, Plaintiff suffered foreseeable harm, including loss of educational opportunity, reputational injury, emotional distress, and impairment of future professional prospects, including bar admission eligibility.

**Count VIII – Intentional Infliction of Emotional Distress (IIED)**

156.    Defendants engaged in a sustained course of conduct that was extreme, outrageous, and beyond the bounds of decency tolerated in a civilized society.

157.    Specifically, Defendants:

- Delivered Plaintiff's academic dismissal via email at 9:30 p.m. on a Friday night, with no warning or transitional support;

- Immediately deactivated Plaintiff's institutional accounts and revoked his ability to contact faculty, request accommodations, or access mental health resources;

- Refused to acknowledge or process Plaintiff's repeated FERPA requests;

- Ignored or rejected Plaintiff's good-faith efforts to resolve matters informally and reintegrate into the academic community;

- Permitted and participated in a process colored by prejudgment, emotional animus, and apparent retaliation for Plaintiff's protected activity under Title IX and the ADA.

158. This conduct was not the result of mere administrative error or insensitivity—it was strategic, punitive, and foreseeably damaging to a student already in psychological distress and under active mental health care.

159. As a direct and proximate result of Defendants' conduct, Plaintiff experienced severe emotional and psychological trauma, including suicidal ideation, hospitalization, and lasting harm to his academic and professional trajectory.

160. Defendants acted intentionally or with reckless disregard for the likelihood that their conduct would cause Plaintiff serious emotional harm.

161. Accordingly, Defendants are liable for compensatory and punitive damages under New York common law.

### Count IX – Civil Conspiracy (42 U.S.C. § 1985 / New York Law)

162. Under New York law and federal law, a civil conspiracy claim requires (a) an agreement between two or more persons, (b) to accomplish an unlawful act, (c) an overt act in furtherance of the agreement, and (d) resulting damage. See Doe v. Solera Capital, LLC, 687 F. Supp. 3d 347, 357 (S.D.N.Y. 2023) (applying Second Circuit conspiracy principles).

163. Under § 1985(3), a conspiratorial agreement to deprive someone of equal protection or privileges can be actionable, so long as there is intent to discriminate against the protected class. See Griffin v. Breckenridge, 403 U.S. 88, 102–03 (1971); see also Peterson v. City of New York, 2011 WL 1051852, at *5 (S.D.N.Y. Mar. 18, 2011).

164.    Here, Defendants Albany Law School, Grand River Solutions, Deans Taranto & Queenan, Title IX staff, and faculty members agreed—implicitly and explicitly—to treat Plaintiff as presumptively culpable, deny procedural fairness, expedite expulsion, and suppress remedial paths.

165.    The October 31, 2024 email from Dean Taranto labeling Plaintiff "harassing," even before any formal complaint was filed, followed by internal coordination with Moran, Barker-Floyd, and others, constitute overt acts in furtherance of that conspiracy.

166.    These intercommunication and coordinated procedural decisions show a "meeting of the minds" to achieve the common, unlawful objective of depriving Plaintiff of his civil rights under Title IX, ADA, and the Constitution.

167.    Defendants' concerted actions amplified the harm: they insulated each other from blame, secured institutional cover, and blocked internal accountability.

168.    In New York, civil conspiracy is not an independent tort but a vehicle for vicarious liability for underlying wrongs (e.g. procedural due process violations, defamation). See Leon v. Martinez, 84 N.Y.2d 83, 88 (1994).

169.    As a direct and proximate result, Plaintiff was expelled, his professional reputation destroyed, and his emotional and economic losses magnified beyond what a single actor could inflict.

170.    Plaintiff seeks compensatory and punitive damages, as well as injunctive relief and declaratory declarations of liability.

### Count X – Negligence and Gross Negligence

171.    Under New York law, a plaintiff asserting negligence must show (a) a duty, (b) breach, (c) causation, and (d) damages. See Palsgraf v. Long Island R.R. Co., 248 N.Y. 339 (1928).

172.    Even in educational settings, institutions owe a duty of care to students to conduct

disciplinary and investigatory processes in a lawful, fair, and non-negligent fashion. See

Irwin v. Trustees of Columbia Univ., 2004 WL 2665657, at *7 (S.D.N.Y. Nov. 19, 2004)

(recognizing negligence claim in academic discipline context).

173.    Defendants breached that duty by (a) dismissing without notice or hearing, (b)

ignoring documented mental health needs, (c) revoking access to communications

immediately, (d) refusing to respond to FERPA record requests, and (e) coordinating

procedures in a biased, precipitous manner.

174.    These acts constitute gross negligence because they reflect a reckless disregard for

Plaintiff's rights, well-being, and foreseeable risk of severe emotional injury. See Basso v.

Miller, 40 N.Y.2d 233, 241 (1976) (gross negligence involves conduct showing "lack of

slight care or an extreme departure from the standards of conduct").

175.    But for Defendants' negligent planning and execution of the process, Plaintiff would

not have suffered expulsion or its cascading harms.

176.    Plaintiff therefore seeks compensatory damages for the full extent of his emotional

distress, reputational loss, economic harm, and punitive damages permitted under New

York law.

**Count XI – FERPA Violation (Educational Records Access / Nondisclosure)**

177.    FERPA (20 U.S.C. § 1232g) and its implementing regulations (34 C.F.R. Part 99)

require educational institutions receiving federal funds to allow students to inspect and

review their education records within 45 days, maintain record confidentiality, and not

disclose personally identifiable information without consent. See U.S. Department of

Education, FERPA regulations.

178.    Although FERPA does not create an express private cause of action, courts in

several circuits have recognized that FERPA's protections can undergird § 1983 claims

for the violation of federally guaranteed rights. See <u>Gonzaga University v. Doe, 536 U.S.
273, 285–86 (2002)</u>; see also discussion in academic commentary that FERPA is
"interpreted by federal courts … as grounded in textual rights enforceable through §
1983."

179.   In the Second Circuit, while there is no binding precedent endorsing a private FERPA
cause of action, lower courts have considered FERPA-based claims in student cases
when used in tandem with § 1983 theories.

180.   Plaintiff submitted multiple timely written requests to inspect and obtain his
disciplinary and Title IX records. Defendants failed to comply within the 45-day period,
never provided meaningful access, and failed to respond in writing explaining any
permissible refusal.

181.   Defendants also permitted internal and external disclosure of education records
without Plaintiff's consent—such as internal emails labeling him "dangerous," "unstable,"
or "harassing"—to third parties including Grand River Solutions staff, faculty, and
possibly external evaluators.

182.   These failures to grant access, refusal to release information, and improper
disclosures violate FERPA's access and confidentiality requirements.

183.   As a result, Plaintiff's ability to mount a defense, protect his bar prospects, and
correct record errors was obstructed, causing reputational harm and emotional distress.

184.   Plaintiff requests declaratory judgment that Defendants violated FERPA, injunctive
relief compelling full inspection and record correction, and any available relief under §
1983 (if the court permits it).

**Count XII – Defamation (Libel / Slander / Defamation per se)**

185.   Under New York law, to state a defamation claim, a plaintiff must allege: (a) a false
statement of fact concerning him, (b) publication to a third party, (c) fault (at least

negligence), and (d) special or per se damages. See <u>Leder v. Am. Broad. Cos., Inc., 199</u> <u>A.D.2d 169, 177 (1st Dep't 1993).</u>

186.    When the defamatory matter imputes a crime, dishonesty, or professional unfitness, it is defamatory per se and damages are presumed. See <u>Liberman v. Gelstein, 80 N.Y.2d</u> <u>429, 435 (1992).</u>

187.    Defendants Taranto, Moran, Barker-Floyd, Cook, Queenan, Wilder, and other agents maliciously published statements and maintained internal records accusing Plaintiff of stalking, harassment, fabrication, emotional instability, and professional unfitness—both inside administrative emails and referencing those records to others, including in contexts where his bar prospects or reputation would be influenced.

188.    These statements were false, made without privilege or justification, and with knowledge or reckless disregard for their falsity.

189.    Those publications were made to other faculty, administrators, Title IX staff, potential readers (e.g., future employers or bar evaluators), and to members of the institution's internal community.

190.    Because the statements cast Plaintiff as dishonest, dangerous, and unfit for the legal profession, they are actionable per se, requiring no proof of special damages.

191.    Plaintiff suffered reputational injury, emotional anguish, loss of employment or bar prospects, and other consequential damages.

192.    Plaintiff seeks retraction, expungement of defamatory records, compensatory and punitive damages, and attorneys' fees.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

A.  Reinstatement to Albany Law School;

B.  Sealing or expungement of all disciplinary and Title IX records;

C. Declaratory and injunctive relief;

D. Compensatory and punitive damages in an amount to be proven at trial but no less than **$4,000,000**;

E. Attorneys' fees and costs under 42 U.S.C. § 1988;

F. Any further relief deemed just and proper.

**CERTIFICATE OF SERVICE**

This is to certify that at true and exact copy of the foregoing and referenced exhibits was this __14th__ day of __10__ deposited in the United States mail, postage prepaid, addressed for delivery, or sent electronically, to:

Bob Sears

Head of Security at Albany Law School

and designated service representative for defendants

80 New Scotland Ave, Albany, NY 12208

John Doe *Pro Se*